UNITED STATES, to Use of SCHUMACKER, v. McINTYRE et al.

(Circuit Court, D. Colorado. November 5, 1901.)

No. 4,049.

1. CONTRACTS—CONSTRUCTION.

The principal defendant had a contract with the United States for the erection of a government building, and contracted with one R. to furnish the stone; the contract giving him the right, on R.'s default, to take possession of the quarry and complete the contract at R.'s expense. R., not having sufficient money to open and operate his quarry, borrowed from plaintiff, giving his note, secured by an assignment of his interest in the contract. Afterwards a tripartite agreement was made, by which defendant was to pay to plaintiff all sums due R. under his contract until the note was paid, plaintiff was given the right to complete the contract in case of R.'s default, and it was further agreed that, in case defendant took possession under the terms of the original contract, he should account to plaintiff for any profits which might become due to R. to the amount of the note. R. was unable to provide the stone as required, and he and plaintiff united in a proposition to defendant to take possession of the quarry and produce the stone as their agent, but without expense to them or the creation of any debts for which they should be liable. This offer defendant accepted, and he produced the stone to complete the contract, but at an expense largely exceeding the contract price. *Held* that, while his entering upon the work as agent for R. relieved the latter from liability under the original contract for the loss, it did not render defendant liable to plaintiff; it not appearing that the amount expended by him in completing the contract was excessive, but that his only obligation, under all the agreements construed together, was to account to plaintiff for any profit which might accrue to the benefit of R. under the original contract.

2. PRINCIPAL AND SURETY—RELEASE OF SURETY BY CHANGE IN CONTRACT OF PRINCIPAL.

Any change in a contract for the performance of which a surety is bound, made without his consent, will operate to relieve him from liabil-

ity; and, where a change has been made in such contract, the burden rests upon one seeking to charge the surety to prove that he knew of and assented to such change.

At Law. Action on the bond of a contractor for government work, for the use and benefit of a creditor of a subcontractor.

Edward L. Shannon and Thomas, Bryant & Lee, for plaintiff.
Hartzell & Steele and A. W. Gillette, for defendants.

RINER, District Judge. It is alleged in the complaint, and admitted in the answer, that in March, 1898, the defendant McIntyre entered into a contract with the United States of America to furnish material and to perform the work required for the construction of the foundation, superstructure, and roof of the United States Mint building in the city of Denver. The record further shows that stone from the Cotapaxi quarries had been selected to be used in the superstructure of the building. In April, 1898, McIntyre furnished his bond to the government, with the defendant the United States Fidelity & Guaranty Company as surety. The bond is set out at length in the complaint, and it is unnecessary to be stated here. It is sufficient to say that it is in the usual form of such surety bonds. In July, 1898, McIntyre entered into a contract with one John H. Routt, under which Routt was to furnish McIntyre stone from the Cotapaxi quarry for the superstructure of the mint building. The testimony tends to show that, at the time Routt made the contract with McIntyre to furnish the stone, he did not have sufficient means to carry on the work of opening the quarry. He applied to Schumacker, the present plaintiff, for a loan of $1,500. The loan was made; Schumacker taking Routt's note for the amount, and Routt assigning to Schumacker, as security, his interest in the contract with McIntyre. At that time a tripartite agreement between Routt, McIntyre, and Schumacker was entered into in respect to the repayment to Schumacker of the $1,500 loaned by him to Routt. The $1,500 proving insufficient to open and operate the quarry, Routt applied to Schumacker for an additional loan of $1,000, which was made, and a new note for $2,750 was given by Routt to Schumacker, dated September 30, 1898. This note was secured by Routt's reassignment of the contract between Routt and McIntyre, and a new tripartite agreement was entered into between these parties with respect to the repayment of this sum of $2,750, including the interest due upon the original loan. The stone from the Cotapaxi quarries proving not satisfactory, the government, as it had a right to do under its contract with McIntyre, changed the stone from the Cotapaxi to Arkins stone, and a new contract, dated October 15, 1898, was entered into between Routt and McIntyre with respect to furnishing the stone from the Arkins quarry, whereby McIntyre agreed to pay Routt 55 cents per cubic foot for all stone delivered and accepted, f. o. b. the cars at Arkins; payments to be made on the measured stone in the building, monthly, from estimates given by the proper government officers, less 10 per cent., which 10 per cent. was to be paid upon the final estimate. Routt's interest in this

contract was also assigned to Schumacker as security for the payment of the $2,750 and the interest, and a new tripartite agreement, dated the same day, was entered into between Routt, McIntyre, and Schumacker, whereby it was provided, among other things, that Routt should assign his interest in his contract with McIntyre to Schumacker as security for his loan; that he would keep Schumacker fully informed with respect to the quantities of stone furnished under said contract, the time of the monthly estimates to be made by the proper government official, and the times when payments of money were to be made by the said McIntyre on account of said contract; that he would not draw any money from McIntyre under the contract without first informing Schumacker in writing of his intentions so to do; that he would, upon the written request of Schumacker, furnish written statements from time to time as to the amount of stone furnished, amounts received therefor or due therefor; and that he would faithfully perform the contract. He further expressly authorized McIntyre to pay over to Schumacker from time to time all moneys due and coming to him upon the contract when the same should become due, payments being based upon the monthly estimates of government officers as set forth in the original contract, until the note and the interest thereon, at the rate of $6\frac{2}{3}$ per cent, per month, should be fully paid. He further agreed to furnish McIntyre with a good bond as in the original contract provided. McIntyre, upon his part, agreed that Routt might assign his contract to Schumacker for the purposes above stated; that, in case of default on the part of Routt in the performance of the contract, he would give Schumacker or his legal representatives the eight days' notice provided for in the contract between Routt and McIntyre; that Schumacker, or his legal representatives or assigns, might carry out and perform the contract in the same manner and to the same effect as though the original contract had been entered into with him; and that, upon three days' notice in writing from Schumacker of his intentions to do so, he (Schumacker) should have the right and privilege of entering into possession of the quarry and performing the contract between McIntyre and Routt. He further agreed that he would accept the order of Routt to pay Schumacker all moneys becoming due to Routt from him as the same should become due under the original contract, payments to be based upon the estimates of the proper officials of the government as set forth in the contract between Routt and McIntyre, and that he would immediately pay to Schumacker all moneys becoming due from time to time to Routt from him under said contract between Routt and McIntyre, until Schumacker's note had been paid in full; and he further agreed that in case he (McIntyre) should enter into possession of the quarries and perform the contract, as therein provided he might do in a certain event, he would pay to Schumacker any moneys due from him (McIntyre) to Routt, up to the amount of the note and the interest. He further agreed that, until the note and the interest had been fully paid according to its tenor, he would, at all proper, seasonable, and necessary times, provide and furnish Routt sufficient money, or

available and marketable credit, to enable Routt to open up and operate the quarries known as the "Chambers Quarries," to remove the stone therefrom, and to keep the men working at that place paid; the amount to be furnished and provided not to exceed $1,500 prior to the 15th of November, 1898. Schumacker, upon his part, agreed that all notices provided for by the contract might be sent to his attorney; that out of the moneys paid to him by McIntyre he would turn over to Routt such an amount as might be necessary to enable Routt to meet the running and operating expenses of the quarry, not to exceed 50 per cent. of the amount so by him (Schumacker) received under the first two estimates, and not to exceed 40 per cent. of the amount received by him under subsequent estimates, and to turn over to McIntyre 20 per cent. of the balance left at such times in the hands of Schumacker, until McIntyre should be fully reimbursed for his advances of cash and credit furnished to Routt. The parties then agreed as follows (and I quote from the contract):

"It is agreed by all of the parties hereto that the said contract of July 6, 1898, and the said tripartite agreement of September 30, 1898, shall not be considered abrogated, annulled, or superseded, so far as the said Schumacker is concerned, or the rights or claims of the said Schumacker thereunder waived, surrendered, canceled, or satisfied, until said contract of October 15, 1898, between the said Routt and McIntyre, shall by its terms go into full force and effect, and not until the said McIntyre shall have furnished to the said Routt the full sum of fifteen hundred dollars ($1,500) in cash or available and marketable credit, as is in said contract provided, or such part thereof as may be reasonably necessary to open up and operate said quarry in a proper and workmanlike manner."

Routt entered upon the work under his contract, and had shipped to Denver several cars of stone (my recollection is that the testimony shows eight cars), although it is in evidence that that particular stone did not go into the mint building by reason of some defect in color. Routt for some reason was unable to prosecute the work as rapidly as required, and on the 25th day of January, 1899, Routt and Schumacker gave McIntyre the following appointment (plaintiff's Exhibit G):

"Denver, Colo., Jany. 25, 1899.

"Mr. John A. McIntyre, Denver, Colo.—Dear Sir: You are hereby authorized and empowered by us, for and on our behalf and as representing us as our agent, but without any expense to us, or either of us, and without incurring any debt for which we, or either of us, may be liable, and in keeping with the terms and provisions of the certain contract now in force and effect between you and the undersigned John H. Routt, and of the certain contract now in force and effect between you, the said Routt, and the undersigned George P. Schumacker, and for the purpose of opening up, quarrying, and removing granite from said quarry, to be used in the construction of the U. S. Mint now in course of erection at Denver, Colorado, to enter into and take possession of the McIntyre quarries at Arkins, Colo.; and it is expressly understood and agreed that this permission and authority is hereby given without waiver of any of the terms and provisions of said contracts, or either of them.

"[Signed]                                          John H. Routt,
                                          "George P. Schumacker."

And McIntyre thereupon proceeded to get out the stone at a cost to him, as shown by Mr. Tuxton's testimony, of $46,536.62.

111 F.—38

While I have referred briefly to the contracts relating to the Cotapaxi quarry, they have no particular bearing upon the controversy now before the court, other than to show the relation of the parties and the circumstances which led up to the contracts of October 15, 1898. The rights of the parties in this suit are to be determined under the contracts executed on the 15th day of October, 1898, and the authority from Routt and Schumacker to McIntyre to operate the quarry, dated January 25, 1899.

It was contended in the argument, and the same contention was repeated in the brief, that Routt's inability to prosecute the work was caused by McIntyre's failure to put up the necessary amount of money to open and operate the quarry as provided in the tripartite agreement, which, it was contended, binds him to furnish funds for that purpose in an unlimited amount. This contention is based upon the following paragraph in the contract:

"And the said McIntyre further covenants and agrees that, until the said note and interest thereon have been fully paid according to its tenor, he will, at all proper, seasonable, and necessary times, provide and furnish the said Routt sufficient money or available and marketable credit to enable the said Routt to open up and operate said Chambers quarry, and remove stone therefrom, and to keep paid the men working at and upon the same; but the amount so furnished and provided shall not exceed the sum of $1,500, prior to November 15, 1898."

Even if this paragraph of the contract should be construed as contended by the plaintiff, the conclusion does not necessarily follow that this was the cause of Routt's inability to comply with the terms of his contract. It is not at all clear, however, that this provision of the contract is entitled to the construction contended for, and was so understood by the parties at the time the contract was entered into. In the closing paragraph on the same page of the contract, we find this provision:

"It is agreed by all of the parties hereto that the said contract of July 6, 1898, and the said tripartite agreement of September 30, 1898, shall not be considered abrogated, annulled, or superseded, so far as the said Schumacker is concerned, or the rights or claims of the said Schumacker thereunder waived, surrendered, canceled, or satisfied, until said contract of October 15, 1898, between the said Routt and McIntyre shall by its terms go into full force and effect, and not until the said McIntyre shall have furnished to the said Routt the full sum of fifteen hundred dollars ($1,500) in cash or available and marketable credit, as is in said contract provided, or such part thereof as may be reasonably necessary to open up and operate said quarry in a proper and workmanlike manner."

This last paragraph would indicate that it was the intent and understanding of the parties, by these several clauses in the contracts referring to the advancements to be made by McIntyre, that they should not exceed the sum of $1,500, or so much thereof as might be necessary to properly open up and develop the quarry mentioned therein; and this view is strengthened by the fact, clearly established by the testimony, that McIntyre was under no obligation whatever to Schumacker in the premises, further than the agreement, on his part, to pay over to Schumacker any moneys in his hands which might become due to Routt, together with his volun-

tary agreement that he would advance Routt temporarily not to exceed $1,500. Taking both of these contracts, and construing them together, it seems to me that the latter construction is not, to say the least, unreasonable. I think that the record clearly shows that the true purpose of this tripartite agreement was to secure to Schumacker, to be applied to the payment of his note, any and all moneys which might become due to Routt from McIntyre under the original contract. However this may be, I think the testimony tends to show that Routt's failure to perform his contract was due to the fact that the expense of getting out the stone exceeded by far the contract price. This is clearly shown by Mr. Tuxton's testimony to the effect that it cost McIntyre $46,536.62 to get the stone, which was largely in excess of the amount to be paid under the contract. I say this is clearly established, because there is no testimony in the case tending to show that McIntyre, after taking charge of the quarry, did not operate it economically, and produce the stone as cheaply as it was possible for any one to do. Having failed to perform his contract, and for the reason just stated, as I think the record tends to show, the memorandum of January 25, 1899, was executed. This memorandum authorized McIntyre, as the joint agent of Routt and Schumacker, to take possession of the quarry, develop it, and produce the necessary granite at his own cost and expense, in accordance with the terms of the contract.

Here we have a new element in determining the rights of parties, namely, that of agency. This appointment authorized McIntyre, as the agent of Routt and Schumacker, to carry out the provisions of the contract between Routt and McIntyre and the tripartite agreement, so that, in ascertaining the true relation of the parties after McIntyre entered upon the work, we must look, not only to the contracts, but also to the new relation—that of an agent—which, by acceptance of the appointment, McIntyre sustained to the other two parties. McIntyre's acceptance is not in writing, but he acted upon the appointment, and is bound to all intents and purposes by its provisions. He undertook, as their agent, to get out the granite in question without contracting any indebtedness for which they should be held liable, and without calling upon them for any cash to carry on the work. The effect of this (and which was undoubtedly the purpose of the parties in making it) was to relieve Routt and Schumacker from the liability imposed on them by that clause of the Routt-McIntyre contract which provides that, in case McIntyre should take possession of the quarry to complete the contract, he should charge the entire expense thereof against the contract. By acceptance of the appointment, he did bind himself to procure the granite without calling upon the others to make up any deficiency; but it does not necessarily follow that, because the effect of this appointment and its acceptance relieves Routt and Schumacker from being called upon to make up any deficiency, McIntyre was to turn over to them the entire proceeds of the granite secured, without any repayment to himself for moneys which he, as their agent, was obliged to advance for the purpose of procuring

the stone. It is undoubtedly true that under these agreements and this appointment, construing them together, if McIntyre had been able to produce the granite for less than 55 cents per cubic foot, he would be bound to account to Routt and Schumacker for any surplus. It is, perhaps, equally true that by the acceptance of the appointment he relieved them from liability for any amount in excess of 55 cents per cubic foot that he might have to pay for its production; but it would be a harsh rule, indeed, that would preclude him, as their agent, from reimbursing himself for expense incurred up to the amount of the contract price, namely, 55 cents per cubic foot. If it cost less than that amount, Routt would have the difference between the contract price and actual cost coming to him, which would inure to the benefit of Schumacker. If it cost that amount, Routt would have nothing coming to him, consequently nothing to apply to the payment of his indebtedness to Schumacker, for which McIntyre would be liable. Under the contract between McIntyre and Routt, Routt was to pay the expenses out of the proceeds. Is it not equally true that, under every principle of agency, Routt and Schumacker having appointed an agent to carry on the work, that agent would be entitled to pay the expenses of getting out the stone out of the funds received, as Routt was bound to do under his contract,—at least, the expense up to the amount of the contract price, namely, 55 cents per cubic foot? For anything in excess of that amount, we have already indicated, McIntyre has perhaps relieved them from liability by accepting the appointment and undertaking the work. As I have already suggested, I think a fair construction of all of these agreements, when taken together and construed in the light of the circumstances surrounding them and the object and purpose sought to be accomplished by them, is that Schumacker was to be protected so far as any moneys coming due to Routt under his contract with McIntyre would serve to protect him; that if it became necessary for McIntyre, as agent of the other two parties, to pay more than the contract price— 55 cents per cubic foot—in procuring the granite, he would have to advance it and stand the loss. On the other hand, if, as a result of his efforts as their agent, the granite was procured for less than 55 cents per cubic foot, then Schumacker was to receive the benefit thereof on account of Routt's indebtedness to him.

Under the testimony, Routt not only has nothing coming to him, but, if a specific performance of his contract had been enforced, he would have had a liability of approximately $28,000 over and above the contract price, from which liability, fortunately for him, McIntyre relieved him by accepting the contract or appointment of January 25, 1899. There being nothing due Routt under his contract, Schumacker is not entitled to recover upon his note against the defendant McIntyre. The view taken of the case, so far as the principal (McIntyre) is concerned, relieves the surety company, the other defendant, from liability, and renders it unnecessary to comment at any length upon the defenses insisted upon by the surety company at the hearing. I will observe, in passing, however, that

the changes, without stopping to enumerate them, made in the original agreement by the tripartite agreement, and the failure of Routt to give a bond for the faithful performance of his contract, without notice to the surety company, would in any event relieve it from liability in this action. I think it is fundamental that any change in the contract for which the surety is liable, made without his consent, will operate his discharge. The surety assures the performance of a certain contract, and his liability is conditioned inflexibly upon the continuance of that particular contract. As stated by a distinguished judge:

"He who would charge a surety for his principal's breach of contractual duty must travel without deviation the way pointed out in the contract, however iron-bound it may be; for there is for the surety, in the enforcement of his bond, no equity nor latitude beyond its strict terms."

At the hearing application was made by the defendant to amend its answer, setting up certain matters with which counsel are familiar, by way of affirmative defense. The court is of the opinion, however, that that is unnecessary, as we cannot assent to the proposition that the burden of the proof is on the surety to show that the alterations in the contract were made without its consent. However, if counsel deems it advisable to so amend the surety's answer, they have the permission of the court to do so.

In order that the rights of all parties may be preserved, I call attention to some objections to testimony, which was received subject to the objections; the ruling to be announced at the time the case was disposed of. The last question on page 25 of the stenographer's transcript was objected to on the grounds there stated. The objection is now overruled, and an exception allowed. The objection to the last question on page 36 of the stenographer's transcript is overruled, and an exception allowed. The motion to strike out certain answers, preceding the motion, on page 38 of the stenographer's transcript, is overruled, and an exception allowed, if the parties desire it. The objection to the first and second questions on page 46 of the stenographer's transcript is overruled, and an exception allowed. The last three questions on page 48 of the stenographer's transcript may stand, to which the plaintiff may object, if he desires to note exceptions thereto. As to the last two questions on page 50 of the stenographer's transcript, objected to on page 51, the objection is overruled, and an exception allowed.

Let a judgment be entered in favor of both of the defendants.